PEOPLE v EBEJER

1. HOMICIDE—NEGLIGENT HOMICIDE—INSTRUCTIONS TO JURY—CONTRIBUTORY NEGLIGENCE—PROXIMATE CAUSE.

A jury in a trial for negligent homicide was properly instructed that contributory negligence on the part of the deceased would not be a defense to the charge but that the conduct of the deceased or a third party should be considered in determining whether the defendant was negligent and whether the defendant's negligence was "the" proximate cause of the death.

2. HOMICIDE—NEGLIGENT HOMICIDE—INSTRUCTIONS TO JURY—CONTRIBUTORY NEGLIGENCE—PROXIMATE CAUSE.

A statement by a trial court that a defendant in a trial for negligent homicide should be acquitted if either the deceased's contributory negligence or the negligence of a third party was "the" proximate cause of the death is merely an inverse way of saying that the *defendant's* negligence must be "the" proximate cause of the death; such statement was neither misleading nor prejudicial nor did it shift the burden of proof to the defendant.

3. EVIDENCE—ADMISSIBILITY—RELEVANCE—DISCRETION OF COURT—ABUSE OF DISCRETION.

Decisions regarding the relevance of proffered evidence are within the discretion of the trial court and should not be disturbed on appeal absent an abuse of that discretion.

4. EVIDENCE—REBUTTAL TESTIMONY—REFUTATION OF OPPONENTS—EXCEPTIONS—EXACT TESTIMONY.

Legitimate rebuttal testimony is limited to the refutation or

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 40 Am Jur 2d, Homicide § 506.
[3] 5 Am Jur 2d, Appeal and Error § 881.
  29 Am Jur 2d, Evidence § 251 *et seq.*
[4] 29 Am Jur 2d, Evidence §§ 250, 269.
[5] 31 Am Jur 2d, Expert and Opinion Evidence § 27.
[6] 8 Am Jur 2d, Automobiles and Highway Traffic §§ 984–986.
  31 Am Jur 2d, Expert and Opinion Evidence § 157.
[7] 58 Am Jur 2d, New Trial § 41.
[8] 75 Am Jur 2d, Trial §§ 202–210.

impeachment of relevant and material evidence properly raised by the opposing party and should not include testimony which should have been introduced in the case in chief; a narrowly drawn exception to the general rule exists where rebuttal testimony is offered to disprove the "exact testimony" given by the defendant.

5. WITNESSES—EXPERT WITNESSES—QUALIFICATIONS—FORMAL EDUCA-TION—EMPLOYMENT EXPERIENCE.

Determination of the qualifications of an expert witness is made by the trial court and formal education is not required where the witness is shown to have acquired special knowledge concerning the subject by reason of his employment.

6. EVIDENCE—ADMISSIBILITY—OPINION OF SPEED—FORCE OF IMPACT—OTHER CONSIDERATIONS.

An estimate of speed based solely on an opinion of the force of impact is not admissible evidence of speed, but an estimate of the speed of a vehicle based on (1) measurements of skid marks made by the vehicle after impact, (2) measurements of the distance between the vehicle's point of impact with another vehicle and its subsequent impact with a third parked vehicle, (3) measurement of the distance the parked vehicle was driven backwards by the impact, (4) examination of the skid marks made by the parked vehicle, (5) examination of gouge marks and scratches in the street, the location of debris and the condition of the vehicles, and (6) photographs taken at the scene, is sufficiently supported to be admissible in evidence.

7. WITNESSES—CRIMINAL LAW—FAILURE TO PRODUCE—REVERSAL—PROCEDURE—MOTION FOR NEW TRIAL.

A defendant desiring reversal of conviction or a new trial because of the failure of the prosecution to produce an unindorsed or indorsed witness must, before filing his brief on appeal, move the trial court for a new trial; at the hearing upon the motion the prosecutor shall produce or explain why he cannot produce the witness or why he did not indorse and produce him at trial.

8. CRIMINAL LAW—PROSECUTORS—OPENING ARGUMENTS—ERRONEOUS INTIMATION—WITNESSES—HARMLESS ERROR.

Any error on the part of a prosecutor in incorrectly intimating to jurors in his opening statement that the defendant would present witnesses in his defense is not unduly offensive to the maintenance of a sound judicial process where there was no deliberate attempt on the part of the prosecutor to coerce the testimony of the accused or to invite the jury to draw adverse

inferences in the event defendant declined to testify and does not require reversal.

Appeal from Recorder's Court of Detroit, Andrew C. Wood, J. Submitted November 15, 1975, at Detroit. (Docket No. 19999.) Decided January 6, 1976.

Robert E. Ebejer was convicted of involuntary manslaughter. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Attorney General, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the people.

*Arthur F. Barkey,* for defendant.

Before: BASHARA, P. J., and D. F. WALSH and W. S. WHITE,* JJ.

D. F. WALSH, J. On January 30, 1974, defendant was convicted, after jury trial, of the offense of involuntary manslaughter, MCLA 750.321; MSA 28.553.

The relevant facts are these. On the evening of September 16, 1972, Detroit police officers Jerrie Savin and Stanley Blouse observed a pair of motorcycles exceeding the lawful speed limit on eastbound Seven Mile in Detroit. Both cycles pulled over to the curb and stopped on northbound Shields Street when it became evident to their drivers that the officers were in pursuit. The policemen identified themselves and ordered the cyclists to turn off their engines whereupon the defendant and his passenger, Dave Gudenau, fled

---

* Circuit judge, sitting on the Court of Appeals by assignment.

the scene on the defendant's Honda 750 motorcycle. The police officers gave chase.

The route followed by defendant in his effort to elude Savin and Blouse is not in dispute, but the defendant's estimated speed at critical points along the way was a seriously contested question of fact. According to the testimony of Savin and Blouse the defendant led them, at speeds of up to 70 or 80 miles per hour, northbound on Shields to East Outer Drive, east on Outer Drive to Justine Street and then south on Justine where the defendant traveled on the sidewalk for a short distance before he crossed a lawn, returned to the pavement and continued south to Seven Mile Road. The officers followed at distances varying from approximately 20 feet to a full city block. Passing through the stop sign at Seven Mile defendant's cycle continued southbound toward the Hilldale intersection located two blocks south of Seven Mile.

Hilldale traffic is regulated by stop signs at that intersection, while Justine is a through street. While defendant's bike proceeded toward the Justine/Hilldale intersection the police officers were held up by traffic at Seven Mile and, except for the bike's red taillight, lost sight of the defendant completely. One of the policemen indicated that, from Seven Mile and Justine, he observed the headlights of an automobile pulling out into the Hilldale/Justine intersection from west to east. The red taillight of the motorcycle then vanished and the officers proceeded to the scene.

Arriving less than a minute after the accident Savin and Blouse observed a late model Cadillac facing east on Hilldale in the middle of the street with a dent in the area of the left front fender. Physical evidence and expert testimony was intro-

duced at trial to show that the defendant's cycle had glanced off the Cadillac, which had entered the intersection to make a left turn, impacted a second time against a parked car on Justine and pushed that vehicle some 28 feet backwards. The people's rebuttal witness, Officer Carl Hasten, estimated defendant's speed at the moment of collision with the Cadillac at approximately 100 miles per hour.

The defendant took the witness stand in his own defense and corroborated much of the previous testimony. His explanation for leaving the scene was that the deceased had told him that he had "downers" (methaqualude) in his possession and so the defendant "kind of panicked and proceeded down Shields". He disputed the officer's statements relative to his speed during the chase indicating that he slowed down to approximately 5 miles per hour at each stop sign. He claimed that as he reached the intersection of Hilldale and Justine he was traveling at a speed of about 15 to 20 miles per hour, intending to turn right onto Hilldale or to continue through in the event the Cadillac at his right remained at the intersection. Defendant said that he had figured the car was going to remain where it was and he attempted to proceed through the intersection. Impact occurred when the Cadillac pulled into the intersection, the defendant being unable to avoid a collision.

Keith Farmer, the driver of the Cadillac, testified that he had stopped and was proceeding into the intersection to make a left turn but never saw the approaching motorcycle and never even saw the bike hit the car.

## I.

The trial judge instructed the jury on involun-

tary manslaughter with a motor vehicle and the included offense of negligent homicide, MCLA 750.324; MSA 28.556. With regard to the former offense the jury was told they should convict the defendant if his gross negligence was "the direct and producing cause" of the death of David Gudenau even though there might have been other causes that contributed. On the subject of contributory negligence of the deceased the jury was advised:

"Now contributory negligence itself is not a defense to this type of an offense or crime providing you are convinced beyond a reasonable doubt that the defendant is guilty of the fourth element of manslaughter. But it is something that you can consider bearing not only on the gross negligence of the defendant, but also bearing on the so-called proximate cause which again is this causal relationship, this direct and producing cause. In other words, in this case, if you determine from the evidence that the direct and producing cause of the death of David Gudenau was, in fact, his own actions or inactions that that was the cause then, of course, your verdict should be not guilty as far as the defendant is concerned."

The court then capsulized Farmer's testimony and told the jury that if it found "the negligence of the Cadillac driver was the direct and producing cause" of the collision and death, then their verdict should be not guilty.

It is the defendant's position that these instructions precluded the jury from considering the negligence of the deceased or the other driver unless it found the conduct of one of them to be *the* proximate cause of the homicide. Defendant argues that this in effect shifted to the defendant the burden of proving that the cause of Gudenau's

death was his own negligence or that of the driver of the Cadillac. We disagree.

The jury was properly instructed that the contributory negligence of the deceased would not be a defense to the charge of negligent homicide or involuntary manslaughter but that the conduct of the deceased or a third party should be considered in determining whether defendant was negligent and whether defendant's negligence was "the" proximate cause of the death. See *People v Campbell,* 237 Mich 424; 212 NW 97 (1927), *People v Jeglum,* 41 Mich App 247; 199 NW2d 854 (1972), IV Proposed Michigan Standard Criminal Jury Instructions, 987 A (final draft).

As to the court's statements that the defendant should be acquitted if either the deceased's contributory negligence or the negligence of a third party was "the" proximate cause of the death, we find that to be no more than an inverse way of repeating that the *defendant's* negligence must be "the" proximate cause of the death. See *People v Scott,* 29 Mich App 549; 185 NW2d 576 (1971). Considered in the context of the entire instruction this statement was neither misleading nor prejudicial, nor did it shift the burden of proof to the defendant.

## II.

The information filed against the defendant stated that he had operated his cycle at speeds in excess of 80 miles per hour through two stop signs and seven open intersections. The court allowed testimony as to these facts at trial.

Defendant contends that these events were too remote from the fatal occurrence to be relevant and that reference to them should have been

stricken from the information and evidence relating to them excluded from the trial.

It is elemental that decisions with regard to the relevancy of proffered evidence are within the discretion of the trial court and should not be disturbed absent an abuse of that discretion. *People v Harrell,* 54 Mich App 554; 221 NW2d 411 (1974). We find no such abuse here. There was no significant time interval between the first part of the chase and the fatal accident. The officers were in continuous pursuit, and, although they were delayed briefly at Seven Mile Road, they arrived at the scene of the accident within a minute after it occurred. Under the circumstances of this case, the testimony relating to the chase was relevant.

### III.

After the defendant had rested, Officer Carl Hasten was permitted to testify as to the estimated speed of the defendant's motorcycle at the moment of impact based upon physical evidence collected and observations made by him at the scene shortly after the collision. His testimony raises three questions: Was it reversible error to allow him to testify as a rebuttal witness; was it reversible error to allow him to testify as to his estimate of defendant's speed at the time of impact; and was his opinion based upon sufficient facts?

Legitimate rebuttal testimony is limited to the refutation or impeachment of relevant and material evidence properly raised by the opposing party. *People v Bennett,* 393 Mich 445; 224 NW2d 840 (1975), 1 Gillespie, Michigan Criminal Law & Procedure, 2d ed, ¶ 407, pp 493–494. Ordinarily a prosecutor is prohibited from calling a rebuttal witness to offer testimony which should have been

received in his case in chief. *People v Quick,* 58 Mich 321; 25 NW 302 (1885). It is still the rule, however, that the decision as to "whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court". *People v Utter,* 217 Mich 74; 185 NW 830 (1921). We are not persuaded that the trial court abused its discretion here.

The speed of defendant's cycle at the time of impact bore directly upon the issue of defendant's alleged negligence. It was properly raised in the information and during the testimony of Officers Savin and Blouse. Technically, then, Officer Hasten's estimation of defendant's speed more properly belonged to the people's case in chief. However, defendant's testimony—including a denial that his speed had exceeded 15 to 20 miles per hour at Hilldale and Justine—paved the way for legitimate prosecutorial impeachment. Hasten's testimony came within the narrowly drawn exception to the general rule on the order of proof since it tended to disprove the "exact testimony" given by the defendant. *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974), *People v Parker,* 65 Mich App 592; 237 NW2d 572 (1975).

Defendant next maintains that the trial court committed reversible error when it allowed Officer Hasten to testify as to his estimate of the speed of the motorcycle at the time of impact.

"Determination of the qualifications of an expert witness is made by the trial court, and this determination will be reversed only for an abuse of discretion." *People v King,* 58 Mich App 390; 228 NW2d 391 (1975). "One does not have to have formal education to be an expert, but may have acquired special knowledge concerning a subject by reason of his employment." *People v Charles*

*Wilson,* 27 Mich App 171; 183 NW2d 368 (1970), *lv den* 384 Mich 840 (1971).

Officer Hasten said he had been associated with the Accident Prevention Bureau of the Detroit police department for over three years prior to the date of the accident and that he had investigated "probably over a thousand accidents". His training with the bureau consisted of four days in an unspecified school and six months work with experienced officers. On the basis of this background of training and experience the trial court ruled that Officer Hasten was qualified to offer an expert opinion. We cannot say that the exercise of the trial judge's discretion was clearly erroneous. See *Brummitt v Chaney,* 18 Mich App 59; 170 NW2d 481 (1969).

It is true, as defendant points out, that an estimate of speed based solely on an opinion of the force of impact is not evidence of speed and is therefore inadmissible because of its lack of probative value. *Jackson v Trogan,* 364 Mich 148; 110 NW2d 612 (1961). This court, however, in *Brummitt v Chaney, supra,* sustained the admissibility of opinion testimony as to the speed of a vehicle based upon the following data which the court reviewed at p 61:

"It was testified to on cross-examination that the day of the accident had been clear and dry; defendant's brakes were in good order; and that the skid marks were 25 feet long. Testimony also adduced that Taylor did not know the coefficient of friction on Baldwin street, the efficiency of defendant's car's brake lining and tires, the weight of defendant's car, or whether the skid marks were made by the front or rear tires."

In this case Officer Hasten based his opinion on the following measurements and observations, all

of which were made by him within an hour or so after the collision:

(1) Measurements of skid marks made by the cycle after impacting with the Cadillac;

(2) measurement of the distance between the cycle's point of impact with the Cadillac and the point of impact with the parked car;

(3) measurement of the distance the parked car was driven backwards by the motorcycle (28 feet);

(4) examination of the skid marks made by the parked vehicle;

(5) gouge marks and scratches in the street, location of debris, condition of the vehicles;

(6) photographs taken by him at the scene.

We find that the data upon which Officer Hasten's opinion was based was sufficient to support the admissibility of the testimony. That Hasten was not trained in the science of metallurgy, as brought out on cross-examination, goes to the weight of the evidence.

## IV.

During the trial the court excused the production of res gestae witness Kenneth Brown, the passenger in the Cadillac which collided with defendant's motorcycle. Prior to making its ruling the court took testimony from Officer Paul Werth. Werth testified that he had taken a statement from Brown shortly after the accident; that he had gone to Brown's home eight or ten times between October 1973 and January 1974 attempting to serve a subpoena; and that he had been told each time by Brown's mother that Brown was in Buffalo, Ohio, where he attended the University of Ohio Tech. Defendant contends the court erred in ruling that the prosecution had exercised due

diligence in its efforts to secure Brown's attendance at trial. Defendant did not move for a new trial before raising the issue in this court as required by *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973), although the effective date of *Robinson* was five weeks prior to defendant's lower court trial.

*Robinson, supra,* provides:

"In appeals filed after this opinion is published, a defendant desiring reversal or a new trial because of a failure to produce an unindorsed or an indorsed witness shall, before filing his brief on appeal, move the trial court for a new trial. The prosecutor shall produce or explain why he cannot produce the witness or, as the case may be, why he did not indorse and produce him at the trial. If the witness is produced at the hearing, he shall be examined regarding his knowledge of the crime. If a new trial be denied, the judge shall state his reasons."

The *Robinson* rule has a twofold purpose. First, it affords the trial court an opportunity to consider evidence on the question of due diligence. Second, it affords the trial court an opportunity to examine the witness—who "shall" be produced at the hearing if possible—regarding his knowledge of the crime. In this case, although the court heard testimony at the trial relating to the question of due diligence it has never had an opportunity to examine the witness regarding his knowledge of the crime. Furthermore, it has not been shown that the witness could not have been produced at the hearing on the required motion for new trial.

Since there has been no attempt to comply with the requirements of *Robinson* we decline to consider the issue relating to failure to produce the res gestae witness.

## V.

Toward the end of his opening statement the prosecutor stated:

"I thank you for the attention you have given me and I would ask you to listen to the testimony of my witnesses and for that matter, the witnesses of the defense. Whatever I say or whatever Mr. Barkey says is not evidence." (Defendant asserts that this remark was accompanied by a hand gesture towards the defense table, but the record neither supports nor refutes this.)

It is urged that the prosecutor's remark jeopardized the defendant's Fifth Amendment privilege against self-incrimination, *Griffin v California,* 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965), constituted a violation of the statute which proscribes adverse comment on a defendant's failure to take the witness stand, MCLA 600.2159; MSA 27A.2159, and in effect coerced the defendant to testify in his own defense.

We find that any error on the part of the prosecutor in intimating to the jurors that the defendant would present witnesses in his defense does not require reversal.

First, the error, if any, was not unduly "offensive to the maintenance of a sound judicial process". *People v Mobley,* 390 Mich 57, 65; 210 NW2d 327 (1973), *People v Swan,* 56 Mich App 22, 31–32; 223 NW2d 346 (1974). There was no deliberate attempt on the part of the prosecutor to coerce the testimony of the accused or to invite the jury to draw adverse inferences in the event the defendant declined to testify. Secondly, the error was "harmless beyond a reasonable doubt". We have reviewed the record and are unable to say, in light of the evidence presented by the people at trial,

that the error contributed to defendant's conviction. See *People v Mobley, supra,* and *People v Swan, supra.*

We have carefully considered the remaining assignments of error and find them to be without merit.

The defendant's conviction is affirmed.